## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| HANNIBAL BURESS | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-Civ-23078 |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED. |
| | ) | |
| CITY OF MIAMI, MIAMI POLICE | ) | |
| OFFICER LUIS VERNE, and MIAMI | ) | |
| POLICE OFFICER ELIO VILLEGAS, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

Plaintiff Hannibal Buress, by his undersigned attorneys, for his complaint against Defendants City of Miami, Miami Police Officer Luis Verne, and Miami Police Officer Elio Villegas, alleges as follows:

### INTRODUCTION

1.       This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Mr. Buress's rights as secured by the First and Fourth Amendments to the United States Constitution.

2.       On December 9, 2017, Defendant Officer Luis Verne targeted Mr. Buress for harassment and arrest after the two men exchanged words.  Even though Mr. Buress had not committed any arrestable offense, Defendant Officer Verne abused his authority and arrested Mr. Buress in retaliation for Mr. Buress expressing his criticisms of the Miami police officer. Defendant Officer Elio Villegas was present the night of Mr. Buress's false arrest, but failed to intervene.

3.      Mr. Buress's wrongful arrest was widely covered by the media and Miami Police Department ("MPD") officials had notice of Officer Verne's violations of federal law and MPD policy.

4.      Unfortunately, Mr. Buress is not the only individual who was targeted by Defendant Officer Verne, who has been the subject of multiple investigations relating to use of force and other rights violations.  Even to this date, MPD officials have failed to appropriately discipline Defendant Officer Verne.

5.      The MPD has a long standing, widespread policy and practice of failing to hold accountable police officers who—like Defendant Officer Verne—violate the law.  Like many other MPD officers, Defendant Officer Verne abuses members of the public with impunity.

6.      The MPD also has a longstanding, widespread policy and practice of targeting community members with unlawful detentions and false arrest.  MPD officers are accused of unlawful detentions and false arrests three times more often than police officers in New Orleans and sixteen times more often than police officers in New York City.

## JURISDICTION AND VENUE

7.       This case arises under the U.S. Constitution and the laws of the United States. This Court has jurisdiction pursuant to 28 U.S.C. §1331 and §1343(a)(3).  This Court has supplemental jurisdiction under 28 U.S.C. §1367(a) over claims arising under Florida state law.

8.      Venue is proper in this district under 28 U.S.C. §1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

9.      Plaintiff HANNIBAL BURESS resides in Chicago, Illinois.  Mr. Buress is a stand-up comedian and actor known for his roles in various productions, including Comedy

Central's television show "Broad City" and movies "The Disaster Artist" and "Spider-Man: Homecoming."  Mr. Buress is also featured in several comedy specials on Netflix.  Mr. Buress is also an entrepreneur and philanthropist.

10.     Defendant CITY OF MIAMI is and at all times mentioned herein was a municipality organized and operating under the laws of the State of Florida.  The City of Miami operates the City of Miami Police Department, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately responsible.  Defendant City was, at all times material to this Complaint, the employer and principal of the Defendant Officers.

11.     Defendant LUIS VERNE is, and was at all times relevant to this action, a law enforcement officer, duly appointed and employed by the City of Miami Police Department.  At all times relevant to this action, Defendant Verne was acting under color of law and within the scope of his employment with the Miami Police Department.  Defendant Verne is sued in his individual capacity.

12.     Defendant ELIO VILLEGAS is, and was at all times relevant to this action, a law enforcement officer, duly appointed and employed by the City of Miami Police Department.  At all times relevant to this action, Defendant Verne was acting under color of law and within the scope of his employment with the Miami Police Department. Defendant Villegas is sued in his individual capacity.

**FACTUAL ALLEGATIONS**

**Miami Police Officer Luis Verne Abused His Power and Violated Hannibal Buress's First and Fourth Amendment Rights**

13.     On December 9th, 2017, Mr. Buress was in Miami to participate in Art Basel,

Miami's annual contemporary art fair.  While Mr. Buress was socializing and drinking with friends at a venue called the Lunchbox, his phone battery died.

14.     At around 9:00 p.m. that night, Mr. Buress left the venue and began walking in the direction of his hotel.

15.     While walking, Mr. Buress saw Defendant Officer Verne and asked Defendant Officer Verne to call him an Uber.  Specifically, Mr. Buress said "call me an Uber and I'll give you $20."  Defendant Officer Verne said no.

16.     Moments after Defendant Officer Verne declined Mr. Buress's request, Mr. Buress observed Defendant Officer Verne—who was wearing his MPD uniform and clearly on duty—interacting with and kissing young women who were leaving a club.  Mr. Buress said to Defendant Officer Verne "you're over there kissing [women] but can't call me an Uber?"  Mr. Buress intended this statement to be a joke.

17.     Defendant Officer Verne responded to Mr. Buress's joke with antagonism and aggression.  He ordered Mr. Buress to leave the street.  At no point was Mr. Buress aggressive, threatening, or behaving in a manner suggesting that he was a threat to Defendant Verne, himself, or any other person.  Defendant Verne had no legal basis to order Mr. Buress to leave the street.

18.     Nevertheless, Mr. Buress complied with Defendant Officer Verne's orders and entered a bar around the corner in search of a phone charger or another patron willing to call an Uber for him.  Even though Mr. Buress was entirely compliant with Defendant Officer Verne's command to leave the street, Defendant Officer Verne followed Mr. Buress into the bar.

19.     Given his compliance with the officer's commands, Mr. Buress interpreted Defendant Officer Verne's actions as threatening and harassing.  Defendant Verne ordered Mr. Buress to leave the bar and asserted that Mr. Buress was too drunk to be on the premises.

20.     At this point, Mr. Buress was confused and concerned by Defendant Officer Verne's persistent harassment.  Mr. Buress asked Defendant Officer Verne, "if I can't be on the street, where do you want me to be?"  Defendant Officer Verne responded by commanding Mr. Buress to leave the bar.

21.     Again, Mr. Buress complied with Defendant Officer Verne's commands and left the premises.  Once the two were outside the bar, Defendant Officer Verne turned on his body camera and again ordered Mr. Buress to leave.  Mr. Buress walked away from Defendant Officer Verne, stopped, turned around, and said into Defendant Officer Verne's body camera, "Hey it's me.  What's up.  This cop is stupid as fuck."  Mr. Buress asserted this opinion while he was backing away from Defendant Officer Verne, clearly demonstrating his intent to comply with the officer's order to leave.

22.     Immediately after Mr. Buress expressed his opinion about Defendant Officer Verne's intelligence, Defendant Officer Verne instructed Mr. Buress to "get out of here."  But then Defendant Officer Verne changed his mind.  In a direct, retaliatory response to Mr. Buress's expression, Defendant Officer Verne ordered Mr. Buress to put his hands behind his back.  Defendant Officer Verne then grabbed Mr. Buress by the arms in an attempt to force his hands behind his back and proceeded to place him in handcuffs on the street.

23.     While this was occurring, Mr. Buress asked Defendant Officer Verne to explain what he was being charged with.  Defendant Officer Verne suggested that Mr. Buress was

"resisting arrest."  At no time did Mr. Buress resist Defendant Officer Verne's attempt to arrest him.

24.     During the arrest, Mr. Buress encountered some of his fans who were walking on the street.  He encouraged his fans to record the arrest and they began to do so.  Defendant Officer Verne told them to "get out of here."

25.     Mr. Buress asked Defendant Officer Verne to read him his rights, and Defendant Officer Verne responded, "I don't have to read you anything."

26.     In response to Mr. Buress's repeated questions regarding the justification for the arrest, Defendant Officer Verne said, "I told you about seven times to leave and you refused to leave.  Learn how to leave."  However, bodycam footage clearly demonstrates that at the time Defendant Officer Verne made the decision to arrest Mr. Buress, Mr. Buress, in fact, was leaving.

27.     Defendant Officer Villegas arrived at the scene and began talking with Defendant Officer Verne while he was standing next to Mr. Buress.  When Defendant Officer Villegas arrived, it was apparent that Mr. Buress was not trespassing, threatening, or causing a disturbance.  Defendant Officer Villegas also witnessed Mr. Buress's confusion and distress regarding the basis for the arrest.

28.     Upon information and belief, Defendant Officer Villegas knew or should have known about Defendant Officer Verne's problematic complaint record and propensity for acting in a rash, short tempered manner.  Defendant Officer Villegas therefore should have fully inquired about the legitimacy of the arrest prior to participating in it; he failed to do so.

29.     At no point did Defendant Officer Villegas intervene to stop Defendant Officer Verne from arresting Mr. Buress and instead allowed Defendant Officer Verne to continue with his actions.

30.     Prior to entering the Defendants' police car, Mr. Buress repeatedly asked why he was being arrested.  The Defendants refused to answer him stating *inter alia*  that he would receive paperwork.  Eventually, the Defendants asserted that Mr. Buress was being detained for trespassing and disorderly intoxication.  During this exchange, Defendant Officer Verne pushed Mr. Buress up against the police car and ripped his shirt.

31.     At no time did Mr. Buress engage in any criminal act.  He did not cause a public disturbance, he was not threatening, he was not endangering the safety of others or property, and he did not trespass onto private property.  Defendant Officer Verne had no legal basis to arrest Mr. Buress, and Defendant Officer Villegas knew that there was no legal basis to arrest Mr. Buress.

32.     Mr. Buress was held in custody for approximately 5.5 hours.  Defendant Officer Verne charged him with disorderly intoxication.

33.     As a result of this arrest and the resulting publicity, Mr. Buress lost paid engagements.  Mr. Buress also was forced to divert his time and financial resources to defend against the false charge Defendant Verne filed against him.  After the arrest, Mr. Buress also suffered severe emotional distress resulting from the Defendants' actions.  This emotional distress caused him anxiety and stress.

34.     Eventually all charges against Mr. Buress were dropped, because there was no evidence to support his conviction.

**The City of Miami Fails to Adequately Supervise and Discipline MPD Officers for Failure to Follow Relevant Policy and Law**

35.     At all relevant times, the MPD, as a matter of policy, practice, and custom, failed to adequately supervise and discipline officers, including the Defendant Officers.  This deliberate lack of supervision and discipline has resulted in wholly foreseeable and widespread violations of people's rights, including the rights of Mr. Buress.

36.     Prior to his false arrest of Mr. Buress, Defendant Officer Verne abused his power as a police officer when, while off duty, he was drinking Fireball whiskey with two other law enforcement officers.  Defendant Officer Verne choked another patron at the drinking establishment and fled the scene prior to the police arriving.  Upon information and belief, MPD failed to impose upon Defendant Officer Verne adequate discipline for this violation of law and policy.

37.     In January 2018, Defendant Officer Verne was reported to have crashed his vehicle into another motorist, displayed his police badge and yelled at the motorist "you don't know who you are fucking with.  If you leave now, I'll forget this happened."  Upon information and belief, MPD failed to impose upon Defendant Officer Verne adequate discipline for this violation of law and policy.

38.     Community members submitted complaints accusing Defendant Officer Verne of excessive force four times: 1) in November 2017 he was accused of using a hobble—a mechanism used to hogtie people; 2) in January 2018 he was accused of using a taser in violation of policy; 3) in February 2018 he was accused of using excessive physical force during an arrest; and 4) in July 2019 he was accused of using excessive physical force during an arrest.

39.     According to a groundbreaking study published by USA Today, nationwide less than 10% of officers in most police forces get investigated for misconduct.  Defendant Officer Verne has been investigated for the four excessive complaints described above, as well as an

8

administrative complaint for engaging in misconduct.  However, Defendant Verne's disciplinary record reveals that despite his many complaints, MPD has failed to relieve him of his police duties or reassign him and has failed to impose upon him adequate discipline.

### Miami Police Department's Failed Accountability System

40.     Community members may choose to file complaints against MPD officers with the MPD's internal affairs department, or directly with the independent Civilian Investigation Panel ("CIP").  The CIP does not have subpoena power and can only make recommendations regarding findings to the MPD.  MPD retains the sole authority regarding whether an officer will suffer any disciplinary consequences.

41.     In 2014, an investigation of the CIP found that the agency received 400 complaints every year, but had only one investigator.  As a result, about half of its cases were closed without a finding.  A recent news report describes that "officers rarely respond to interview requests during CIP inquiries" because officers are "not obligated to participate and cannot be subpoenaed—but the panel has found in multiple cases that camera footage and other evidence contradict officer accounts."

42.     MPD internal affairs also investigates instances of police misconduct.  From 2016 until 2017, 73% of all complaints filed with MPD internal affairs were closed with no finding. Newspaper accounts of the internal affairs process document that "the departments' internal investigations seemingly did not have citizens' best interests at heart."[1]

---

[1]  Jerry Iannelli, Miami Police Complaints Jumped 24 Percent From 2016 to 2017, Overwhelmingly From Black Residents, Miami New Times (Nov. 21, 2018), available at https://www.miaminewtimes.com/news/miami-police-complaints-jumped-24-percent-in-2017-10926762.

43.     MPD policymakers have long been on notice that the accountability system fails to hold accountable officers who abuse their power and violate the rights of community members.

44.     In 2003, the Department of Justice ("DOJ") first investigated the Miami Police Department.  That investigation found multiple "areas of concern" regarding MPD's police accountability system.[2]

45.     The 2003 DOJ report noted that "interviews with community group leaders revealed sentiments that the MPD's citizen complaint process is generally unknown or believed to be ineffective."  The report further noted that MPD policies and practice appear to "discourage the filing of complaints" and recommended that "all complaints against officers be investigated to the extent possible regardless of the source of the complaint or the reluctance of the complainant."  The DOJ report found that MPD's accountability system led to "dubious" conclusions about officer action.

46.     In 2006, the DOJ issued a technical assistance to MPD again calling on the department to improve its accountability system and to ensure that investigators "consider all relevant evidence."[3]

47.     The DOJ conducted a follow up investigation in 2013 and found its concerns relating to MPD's accountability system persisted and that the failures of the accountability system contributed to a pattern and practice of unreasonable force.[4]  Specifically, the DOJ found

[2]  Investigation of the Miami Police Department, U.S. Department of Justice, Civil Rights Division (Mar. 13, 2003), available at https://www.clearinghouse.net/chDocs/public/PN-FL-0001-0001.pdf.
[3]  Investigation of City of Miami Police Department, U.S. Department of Justice, Civil Rights Division (July 9, 2013), available at https://www.justice.gov/sites/default/files/crt/legacy/2013/07/09/miami_findings_7-9-13.pdf (the 2013 report summarizes the technical assistance letter).

[4]  *Id.*

that between 2008 and 2011 the MPD fully investigated only 24 of 33 shootings and "allowed multiple investigations to remain unfinished for three years or longer."  The 2013 report found that MPD's failure to conduct timely investigations and to hold officers accountable "created an environment in which unnecessary harm occurred and in which the threat of future unnecessary harm persists."

48.     The DOJ reports focused on use of force, but an examination of complaints regarding other types of police misconduct reveals that MPD's accountability system fails to adequately respond to all varieties of police misconduct.  The agency also fails to hold accountable the scores of officers who engage in misconduct that is less than lethal—but clearly violative of MPD policy and federal law.

49.     Defendant Verne is one of many MPD officers who have escaped consequences for violating MPD policy and federal law.  Other officers who have abused community members with impunity include:[5]

> i.   On November 9, 2015, Officer Targia threw a suspect into a police car and caused injury to the suspect's mouth.  Despite this use of excessive force the officer received no discipline.
>
> ii.  On July 26, 2016, a man and some friends were getting ready to leave the front porch of his mother-in-law's house when Officer Floyd Pinckney and an unknown officer told him, "You come here, your friends don't have to tell you that we are coming, we are going to get you anyway, and

---

[5]  Unless otherwise indicated, summaries of the complaints included in this Complaint are taken from complaint investigations described in the Civilian Investigative Panel Agenda Packets from 2016-2018, http://miamifl.iqm2.com/Citizens/Calendar.aspx?From=1/1/2016&To=12/31/2016, and the CIP recommendations and the responses from the MPD from the same time period, http://archive.miamigov.com/cip/letterstochief.html.

we'll keep messing with you, fuck nigger, we are going to get you, we are going to get your ass." The man filed a Discourtesy allegation. Attempts were made unsuccessfully to contact Officer Pinckney and the man. No disciplinary action was recommended or imposed against Officer Pinckney.

iii.   On September 14, 2016, a man complained that Officer James Fraser ran him over, struck him on his right side, and knocked him off his bicycle into a wall with a marked police vehicle. He filed a complaint for Abusive Treatment. CIP was unsuccessful in attempting to contact the complainant. No disciplinary action was recommended or imposed.

iv.   On September 20, 2016, a man was stopped for speeding by Officer Luis Ortiz. Officer Ortiz grabbed the man by his collar, lifted him in the air, carried him to the police vehicle, and slammed his head. Officer Ortiz punched him in the groin and threatened to arrest him. The man filed a complaint for Abusive Treatment. No disciplinary action was recommended or imposed.

v.   On October 1, 2016, a woman attempted to record Officer Marcel Jackson handcuffing someone in response to a domestic disturbance in her home. Officer Jackson told her to put down her phone, then grabbed and twisted her arm. Officer Jackson pushed her onto the couch and handcuffed her with his right knee in her back. She filed a complaint for Abusive Treatment. No disciplinary action was recommended or imposed.

vi. On December 15, 2016, a woman observed several City of Miami officers searching her vehicle. The officers were identified to be Officer Mark Ashton and Officer Ketra Alexander. She asked if they had probable cause, and Officer Ashton told her he could search whatever he wanted. She called the station to request a supervisor. She filed a complaint for Discourtesy. No disciplinary action was recommended or imposed.

vii. On December 20, 2016, Officer Muina, who was in an unmarked car, pointed his weapon at a man who was in his parked car using his computer. The man called 911 because he did not recognize the officer as law enforcement. The officer slammed the man on the roof of the car, cuffed him, and used foul language. The CIP voted to sustain the allegation of discourtesy, but the officer was not disciplined for the improper procedure and missing property allegations.

viii. On May 3, 2017, a woman filed a complaint against Officer Nicania Cange-Talton alleging abusive treatment. She stated that Officer Cange-Talton had used her knee to strike her during an arrest. The CIP voted to sustain the allegations of negligence of duty but Officer Cange-Talton was not disciplined.

ix. On June 12, 2017, a man was approached by an unknown white, Hispanic officer who handcuffed him and placed him in the back of a police vehicle because he was intoxicated. When Mr. Ortega attempted to exit the vehicle, the officer pushed him back in, injuring him. He was not arrested.

He filed a complaint for Improper Procedure.  No disciplinary action was recommended or imposed.

x.  On July 5, 2017, during the course of a man's arrest, Officers Ruddens Cherrelus and Claude Adam slammed him to the ground and took inappropriate pictures of the man with their personal cell phones while he was in custody.  The case addressing the Improper Procedure, Discourtesy, and Abusive Treatment claims was closed and the officers were not disciplined.

xi.  On July 19, 2017, a man woke up in the hospital after he was beaten and arrested by Officers Maximillian Kenhan and Bryan Garcia for no reason. While at the hospital, the man alleged that the short officer told him he was the one who did the "ass whooping" and "kicked his ass himself."  A complaint was filed against the two officers for Abusive Treatment and Discourtesy.  No discipline was recommended or imposed on the officers.

xii.  On July 29, 2017, a man was pushed into a police vehicle and told to shut up by Officer Armando Valdes.  He was handcuffed too tightly, the air conditioner was off, and the windows were closed as he sat in a police vehicle.  The officer struck him eight times on the left side of his face.  He filed a complaint for Discourtesy, Improper Procedure, and Excessive Force against Officer Valdes, Officer Guillermo Guzman, and an unknown officer.  No disciplinary action was taken against any of the officers.

xiii.   On August 20, 2017, after a man refused to comply with Lieutenant Kevin Harrison's orders, the other officers at the scene used profane language and pointed a weapon at him.  He was handcuffed and slammed into the ground, resulting in injury.  The Lieutenant placed his knee on the man's neck and bounced on him several times.  When he went to retrieve his property, some money was missing.  He filed a complaint for Discourtesy, Improper Procedure, Excessive Force, and Missing Property against Lieutenant Harrison.  No disciplinary action was recommended or imposed.

xiv.   On December 14, 2017, Officer Sarah Mendoza-Pujols almost hit a community member with her vehicle while driving recklessly while on her cell phone.  After this happened, the officer turned on her sirens in an apparent abuse of authority.  The CIP voted to sustain the allegation, but the officer was not disciplined.

xv.   On August 9, 2018, several unknown officers went to a woman's apartment to execute an arrest warrant, ordering her out of the house in her pajamas without telling her what was going on.  While inside, they knocked over a table.  Then they informed her that they had the wrong apartment number.  No disciplinary action was recommended or imposed.

**Miami Police Department Has a Police and Practice of Unconstitutional Abuses of Power Including Unlawful Detentions and False Arrests**

50.   At all relevant times, the MPD, as a matter of policy, practice, and custom, maintained a policy and practice of subjecting community members to unconstitutional abuses of

power, including unlawful detentions and false arrests.  This police and practice has resulted in wholly foreseeable and widespread violations of people's rights, including the rights of Mr. Buress.

     51.     In 2003, the United States Department of Justice concluded that it "observed officers making coercive stops in crime suppression sweeps without it being clear to us that those stops were based on reasonable suspicion that a crime had been or was about to be committed."

     52.     During the relevant time period, MPD received allegations of false arrest far more frequently than other comparable police departments.  In 2017, 1.8% of all complaints filed against MPD officers alleged false arrests.[6]  For the same period in New York City, only 0.11% of all complaints against police officers alleged retaliatory arrests.[7]  And in New Orleans only 0.54% of all complaints against police officers alleged false arrest.[8]  Specific allegations of false arrest and/or unlawful detention against MPD officers include the following:

          i.     On May 5, 2005, the City of Miami settled a false arrest claim against officers who were alleged to have manufactured probable cause to arrest a woman, who was arrested after MPD officers claimed that she and her vehicle smelled like marijuana.  The district court granted the officers' motion for summary judgement, but the Eleventh Circuit reversed, finding material issues of fact relating to whether the officers: "1) manufactured

---

[6]  Annual Report 2017, Civilian Investigation Panel, available at http://archive.miamigov.com/cip/docs/AnnualReport2017.pdf.

[7]  *Data Transparency Initiative*, NYC Civilian Complaint Review Board, https://www1.nyc.gov/site/ccrb/policy/data-transparency-initiative-allegations.page#allegations_type (last visited July 18, 2020).

[8]  *NOPD Misconduct Complaints*, City of New Orleans Open Data, https://data.nola.gov/Public-Safety-and-Preparedness/NOPD-Misconduct-Complaints/gz2m-ef5u/data (last visited July 18, 2020).

probable cause, (2) failed to conduct a reasonable investigation, and (3)

ignored certain facts within their knowledge." *Kingsland v. City of Miami*,

382 F.3d 1220, 1231 (11th Cir. 2004).

ii.   On May 21, 2015, Officers Dairon Williams and Joseph Byars illegally

entered a woman's apartment and arrested her.  When they entered, an

officer said, "Freeze, put your hands up or I will blow your fucking head

off, don't move."  She filed a complaint with IA who failed to take action.

iii.   On April 3, 2016, a man called police after he was beaten up by security

officers at a club.  Officers responded to the club, and after talking to the

club manager, told the man to leave and refused to help him.  As the man

was leaving, he attempted to take a photograph of Officer Diaz's police

vehicle information in order to make a complaint against the officer.

Officer Diaz responded by arresting the man in retaliation for the

photograph.  The CIP voted to sustain an allegation of Negligence of Duty

against Officer Diaz, but the officer was not disciplined.

iv.   On April 23, 2016, Officers Mario Gonzalez and Adrian Valle, as well as

Major Armando Aguilar, were accused of improperly arresting, searching,

and reporting on a person that was allegedly falsifying identification as a

police officer.  The person also claimed that the officers tampered with

evidence and filed false reports.  The CIP did not sustain the allegations

and none of the officers, nor the Major, who was aware of the officers'

actions, were disciplined.

v.   On May 16, 2016, Officer Desreen Gayle improperly arrested a woman after the woman made a 911 call to report her ex-boyfriend for trespassing on her property and stalking her.  Additionally, Officer Gayle made inappropriate remarks to the woman about the domestic battery.  Officer Gayle was not disciplined.

vi.   On June 28, 2016, Officer Francois improperly threatened a homeless person with arrest and was not subject to any discipline.

vii.   On August 20, 2016, a man observed Officer Kirwich Joseph run a stop sign.  Officer Joseph pulled the man over and approached the vehicle with his hand on his gun holster after the man swerved to miss the police vehicle.  The officer told the man to exit the car or be arrested.  He was handcuffed and put in the back of the police vehicle, while the officer used profanity.  He was then released.  No disciplinary action was recommended or imposed.

viii.   On September 6, 2016, unidentified officers conducted a traffic stop on a man who was driving with his minor child.  MPD officers with their guns drawn ordered the man out of his vehicle, searched him, and detained him in the police car for over an hour.  During this time the man was separated from his child.  No disciplinary action was taken against these officers.

ix.   On September 16, 2016, Officer Katethleen Rodriguez and Officer Roselyn Paz responded to an incident and told a man uninvolved with the incident to sit on the sidewalk while they spoke to the parties involved. He refused, but the officers told him if he didn't sit down he would go to

jail.  He was handcuffed and detained in the back of a police vehicle for approximately 45 minutes and then let go.  No disciplinary action was recommended or imposed.

x.  On November 29, 2016, a man was driving home.  Three marked police cars were blocking the roadway.  A female officer directed him to go around the block.  He went around the block and backed into his driveway.  Officer Shane Tardieu drove to where he was parked, activated his emergency lights, and asked him to get out of the car.  The man complied and his mother came outside to ask what was happening.  Officer Tardieu asked him to take two steps back while his hands were on the trunk of the car.  He did not comply because he was talking with his mother.  Officer Tardieu grabbed the back of his shorts, pulling him back two steps.  He was handcuffed and placed in the back seat of the police car by Officer Tardieu.  He asked a female officer why he was being arrested and she told him he looked suspicious because of his tinted windows.  Officer Tardieu opened the rear door of the police car, told him to get out of the car and removed the handcuffs.  The man asked for the officer's name and badge number and Officer Tardieu replied that his name was on the police report he previously generated for him a few months earlier.  Officer Tardieu told him, "take your fucking ass home, before I take you to jail."  The man was released with no arrest made nor summons issued.  No disciplinary action was recommended or imposed against Officer Tardieu.

xi.  On January 28, 2017, Officer Josue Herrera improperly detained a man after he attempted to override his self-exclusion order at a casino.  Officer Herrera also used excessive force during the arrest and refused to reveal his badge number or captain's name.  Officer Herrera was not disciplined for the improper procedure, abusive treatment, or discourtesy complaints.

xii.  On February 9, 2017, a woman and six others were approached by Officer Daniel Mocombe, telling them to leave the area.  When the woman asked why, the officer grabbed her by both arms and stated that she was being arrested for trespassing.  The officer damaged her identification after she gave it to him.  No disciplinary action was recommended or imposed.

xiii.  On February 15, 2017, Officer Wesner Moise improperly arrested a woman at a homeowners association community meeting when she attempted to get the attention of the chairperson.  During the arrest, Officer Moise's force was so extreme that the woman fell and needed immediate medical treatment.  Officer Moise was not disciplined.

xiv.  On March 26, 2017, Officer Armando Riagu and Officer Ellias Parrales pushed a civilian to the ground, handcuffed him, went through his pockets, and then told him to leave the music festival.  After discovering that money was missing from his wallet, the man tried to ask multiple officers for help in making a complaint but no officer was willing to help him.  When he returned to the venue to try to find a supervisor, he encountered Officer Parrales again.  When he requested Officer Parrales' name and badge number and the information of the other officer involved, Officer

Parrales arrested him.  Neither Officer Parrales, Officer Riagu, nor the officers who refused to help him with a complaint were disciplined.

xv.  On April 29, 2017, a woman was arrested by Officers Adrian Cabello and Lazaro Marquez and charged with "Trespass Property after Warning, Resisting Officer without Violence to his person, and Obstructing Police Officer, Firefighter."  She alleges that Officer Cabello prevented her from leaving Club Eleven by standing in front of her vehicle and that Officer Marquez aggressively banged on the driver's side window.  She claims that if the officers would not have prevented her from leaving, she would not have been arrested.  No disciplinary action was recommended or imposed.

xvi.  On May 4, 2017, a man alleges that he was arrested by Officer Juan Casiano for no reason after he refused to provide an officer with his social security number.  No disciplinary action was recommended or imposed.

xvii.  On May 21, 2017, a man requested assistance from Officer Marc Harris after being battered by bouncers at a club.  However, instead of resolving the conflict, Officer Harris threatened the man with arrest, grabbed both of his arms, slammed him against a wall, and handcuffed him.  Additionally, Officer Harris told him that if he did not apologize to the bouncer he would be subject to arrest.  Officer Harris was not disciplined.

xviii.  On June 3, 2017, a man said that Officers Chiquita Singletary and Raul Arcia entered his home without permission or warrant and falsely arrested him.  He was arrested and charged with Domestic Violence Aggravated

Battery and Resisting an Officer without violence.  No disciplinary action was recommended or imposed against the officer.

xix.   In December 2017, MPD Captain Javier Ortiz pushed a woman to the ground and broke her wrist and arrested her after she asked officers why they were arresting her boyfriend.  Captain Ortiz has amassed 43 civilian complaints and 18 incidents of excessive force.  The woman filed a complaint about this incident with the CIP.  Upon information and belief, Captain Ortiz has suffered no consequence for his wrongful arrest of the woman.[9]

xx.   On May 23, 2018, unknown officers detained a woman's son at gunpoint in her front yard, caused damage to her property, entered her home without permission, and detained her and her mother at gunpoint while they conducted a search.  No disciplinary action was recommended or imposed.

xxi.   On June 8, 2018, a man was in a dispute with his son's mother, when Officer John Gonzalez stopped them.  Although both of them said they were arguing about the car keys, Officer Gonzalez arrested the man for Aggravated Battery on a Pregnant Victim, even though the woman was not pregnant.  No disciplinary action was imposed or recommended.

xxii.   On December 10, 2018, Miami Police Officer Ionnies Llanes first claimed the public park where a man had been sitting was closed even though the

---

[9]  Jerry Iannelli, Overside Board Finds Miami Police Capt. Javier Ortiz Broke Woman's Wrist, Miami New Times (Feb. 25, 2020), available at https://www.miaminewtimes.com/news/miami-police-officer-javier-ortiz-broke-womans-wrist-panel-finds-11564770.

sign listing park rules makes no mention of hours of operation.  Officer

Llanes then accused the man of throwing something on the ground,

insinuating that he had dumped illegal drugs, but no drugs were found.

The officer arrested the man for resisting arrest and the charge was

dismissed by prosecutors.

xxiii.  On April 10 2020, Sergeant Mario Menegazzo detained and handcuffed a

physician who was providing care for homeless people in the midst of the

COVID-19 pandemic.  MPD officers handcuffed and detained the

physician in front of his home allegedly in response to complaints of

"trash dumping" in the neighborhood.  The officer was exonerated of any

police violation.[10]

## COUNT I – FALSE ARREST
**(Fourth Amendment Claim for Damages under 42 U.S.C § 1983 Against Defendant Verne)**

53.     Mr. Buress repeats and realleges the preceding paragraphs as if fully set forth in

this Count.

54.     Count I is alleged against Defendant Officer Luis Verne.

55.     The actions of Defendant Officer Verne described herein, which included falsely

detaining, arresting, and imprisoning Mr. Buress without reasonable suspicion or probable cause,

violated Mr. Buress's Fourth Amendment right to be free from unreasonable search and seizure.

---

[10]  Johnny Diaz, Cuffing of Black Miami Doctor Was Justified, Review Finds, The New York Times
(May 18, 2020), available at https://www.nytimes.com/2020/05/18/us/armen-henderson-miami-
police.html.

56.     Defendant Officer Verne's misconduct was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

57.     The actions of Defendant Officer Verne were the direct and proximate cause of the violation of Mr. Buress's Fourth Amendment rights, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

## COUNT II – FIRST AMENDMENT – RETALIATORY ARREST
### (First Amendment Claim for Damages under 42 U.S.C. §1983 Against Defendant Verne)

58.     Mr. Buress repeats and realleges the preceding paragraphs as if fully set forth in this Count.

59.     Count II is alleged against Defendant Officer Luis Verne.

60.     As described in detail above, Mr. Buress was engaged in constitutionally-protected speech by asking Defendant Officer Verne to turn his body camera on, using profanities while speaking with Defendant Officer Verne, and asking Defendant Officer Verne the reason for his arrest.

61.     Defendant Officer Verne retaliated against Mr. Buress for engaging in protected speech by causing him to be arrested without probable cause.  Mr. Buress's constitutionally-protected speech was a substantial and motivating factor for Defendant Verne's actions to cause him to be arrested.  Defendant Verne's actions were intended to make Mr. Buress, whose constitutionally-protected speech offended Defendants, suffer harmful consequences for his expression and chill his rights guaranteed under the First Amendment.

62.     The Defendants' retaliatory conduct violated Mr. Buress's right to free speech under the First and Fourth Amendments to the United States Constitution.

24

63.     At all relevant times, Defendant Officer Verne was aware that Mr. Buress was engaged in constitutionally-protected speech when he violated Mr. Buress's rights.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Mr. Buress's clearly established constitutional rights.

64.     As a direct and proximate result of Defendant Officer Verne's actions, Mr. Buress suffered damages, including pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

## COUNT III – FAILURE TO INTERVENE
### (42 U.S.C. § 1983 Claim for Damages against Defendant Villegas)

65.     Mr. Buress repeats and realleges the preceding paragraphs as if fully set forth in this Count.

66.     Count III is alleged against Defendant Officer Villegas.

67.     Defendant Officer Villegas had the opportunity and the duty to intervene on behalf of Mr. Buress and prevent the constitutional violations described above, but declined or refused to do so.

68.     Defendant Officer Villegas' misconduct was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Mr. Buress's clearly established constitutional rights.

69.     As a direct and proximate result of Defendant Officer Villegas' actions, Mr. Buress suffered damages, including pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

## COUNT IV - UNLAWFUL POLICY AND PRACTICE
### (*Monell* Claim for Damage under 42 U.S.C. §1983 Against Defendant City of Miami)

70. Mr. Buress repeats and realleges the preceding paragraphs as if fully set forth in this Count.

71. Count IV is alleged against Defendant City of Miami.

72. The City of Miami through its Police Department, has interrelated de facto policies, practices, and customs which include failing to adequately supervise and discipline MPD officers who violate the law and MPD policy, and unlawfully detaining and falsely arresting and harassing community members.

73. These interrelated policies, practices, and customs alleged above are well-known within the MPD.

74. The MPD is aware of the harms suffered by community members as a result of the MPD's failure to hold accountable officers who abuse their power and violate the rights of community members, in particular their Fourth Amendment rights.

75. The City has implemented, enforced, encouraged, and sanctioned MPD's policies, practices, and customs of failing to adequately supervise and discipline MPD officers who engage in misconduct.

76. The MPD and the City have acted with deliberate indifference to the rights violations of community members as a result of the MPD's failed accountability system.

77. The actions of the Defendant Officers as alleged in this Complaint were the result of the MPD's widespread policies, practices, and customs alleged above because the Defendant Officers knew they could abuse their power with impunity.

78. The widespread policies, practices, and customs of the MPD were the direct and proximate cause of the violations of Mr. Buress's constitutional rights and the damages he

suffered, including pain, suffering, mental distress, anguish, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

## COUNT V– MALICIOUS PROSECUTION
### (State Law Claim for Damages Against Defendant Verne)

79.     Mr. Buress repeats and realleges the preceding paragraphs as if fully set forth in this Count.

80.     Count V is alleged against Defendant Officer Verne.

81.     A criminal proceeding in the Circuit Court of Miami-Dade County, Florida was commenced against Mr. Buress.  The person responsible for the initiation of the criminal proceeding was Defendant Officer Verne.

82.     The criminal proceeding ended in a nolle prosequi in favor of Mr. Buress on all charges.

83.     There was an absence of probable cause for the original proceeding.  At the time of the original proceeding, Defendant Officer Verne did not have probable cause to arrest or prosecute Mr. Buress for any of the charges.  Specifically, Mr. Buress's criticism of Defendant Officer Verne does not give rise to a disorderly intoxication under Florida law.

84.     There was malice on the part of Defendant Officer Verne because he arrested Mr. Buress even though he knew there was not a scintilla of probable cause to support the arrest and the continued prosecution.  Defendant Officer Verne fabricated probable cause which was clearly refuted by his body camera.  Defendant Officer Verne was the driving force of the criminal proceeding against Mr. Buress as there was no other basis for the prosecution of the matter except for Defendant Officer Verne's false affidavit.

85.     Mr. Buress suffered damages as a result of the criminal proceeding.  As a direct and proximate result of Defendant Officer Verne's actions, Mr. Buress suffered damages,

including pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

### COUNT VI – FALSE ARREST
### (State Law Claim for damages Against Defendant Verne)

86.     Mr. Buress repeats and realleges the preceding paragraphs as if fully set forth in this Count.

87.     Count VI is alleged against Defendant Officer Verne.

88.     Mr. Buress was unlawfully detained when he was intentionally restrained by Defendant Officer Verne against his will and without arguable reasonable suspicion or probable cause to detain Mr. Buress for disorderly intoxication.

89.     Mr. Buress's detention was unreasonable and unwarrantable under the circumstances because his behavior did not amount to disorderly intoxication and he did not endanger public safety or cause a public disturbance.

90.     Additionally, a reasonable officer would not have arrested Mr. Buress under the same circumstances as Defendant Officer Verne at the time of the arrest.

91.     Furthermore, Defendant Officer Verne arrested Mr. Buress for disorderly intoxication in bad faith and with malicious purpose as retaliation for Mr. Buress's offensive, though constitutionally-protected, speech.

92.     Defendant Officer Verne's bad faith and malicious intent is evident in his decision to arrest Mr. Buress only after Mr. Buress called him names, as well as his failure to articulate the reason for arrest in a timely manner despite Mr. Buress's many inquiries.

93.     As a direct and proximate result of Defendant Officer Verne's actions, Mr. Buress suffered damages, including pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Hannibal Buress requests that this Court enter judgment in his favor against Defendants, awarding compensatory damages, costs and attorneys' fees, and punitive damages against each of the Defendants in their individual capacities, and for such further additional relief as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiff demands trial by jury.

Dated: July 24, 2020

Respectfully Submitted,

**HANNIBAL BURESS**

By: s/Faudlin Pierre
Faudlin Pierre
PIERRE SIMON
600 SW 4th Avenue
Fort Lauderdale, Florida 33131
(305) 336-9193
Fplaw08@yahoo.com
FBN. 56770

Sheila A. Bedi*
Mariah Young**
Allison Clark**
Community Justice Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-2492
sheila.bedi@law.northwestern.edu

Vanessa del Valle*
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue

Chicago, IL 60611
(312) 503-1271
vanessa.delvalle@law.northwestern.edu

Brendan Shiller*
Shiller Preyar Jarard & Samuels
@ The Westside Center for Justice
601 S. California
Chicago IL 60612
312-226-4590
Brendan@shillerlaw.com

*Pro hac vice motion to be filed
** Student Attorneys